TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

NATALIE BAUGHMAN, District of Columbia Bar No. 997075
JEFFREY HAMMONS, District of Columbia Bar No. 1615376
Trial Attorneys
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044
Telephone: (202) 353-5027 (Baughman); (202) 598-6925 (Hammons)
Facsimile: (202) 514-8865
Email: Natalie.Baughman@usdoj.gov; Jeffrey.Hammons@usdoj.gov

SONYA J. SHEA, California Bar. No. 305917
Senior Attorney
Environment and Natural Resources Division
U.S. Department of Justice
999 18th Street; South Terrace; Suite 370
Denver, CO 80202
Telephone: (303) 844-7231 (Shea)
Email: Sonya.Shea@usdoj.gov

JOSHUA D. HURWIT, Idaho State Bar No. 9527
United States Attorney

CHRISTINE G. ENGLAND, Idaho State Bar No. 11390
Assistant United States Attorney
District of Idaho
1290 W. Myrtle St. Suite 500
Boise, ID 83702-7788
Telephone: (208) 334-1211
Facsimile: (208) 334-9375
Email: Christine.England@usdoj.gov

*Attorneys for Plaintiff, United States of America*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

UNITED STATES OF AMERICA

Plaintiff,

v.

ACE BLACK RANCHES, LLP

Defendant.

Case No. 1:24-cv-00113

**AMENDED COMPLAINT**

Plaintiff United States of America, by authority of the Attorney General of the United States, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action against Ace Black Ranches, LLP ("Defendant"), under Sections 309(b) and (d) of the Clean Water Act. 33 U.S.C. § 1319(b) and (d). Plaintiff alleges that Defendant discharged and is continuing to discharge pollutants to waters of the United States in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

2. Defendant discharged pollutants, including sediment, sand, gravel, dredged and/or fill material, and storm water to both the Bruneau River and wetlands adjacent to the Bruneau River. As detailed below, both the Bruneau River and its adjacent wetlands are waters of the United States covered by the Clean Water Act. Some of Defendant's discharges were directly to the Bruneau River and some were to adjacent wetlands. All those discharges violate the Clean Water Act.

3. Defendant owns a roughly 800-acre ranch in Bruneau, Idaho (the "Ranch"). The Ranch sits in the heart of the Bruneau Valley, and the Ranch itself is bisected by the Bruneau River. The Bruneau River, its tributaries, and wetlands provide important habitat for fish and other aquatic life, as well as essential resources for birds and mammals.

4. Upriver of the Bruneau Valley, nearly 40 miles of the Bruneau River is designated as a wild river under the Wild and Scenic Rivers Act. A portion of the C.J. Strike Wildlife Management Area abuts the Ranch upriver to the south. From the Ranch, the Bruneau River flows generally north to the Bruneau Arm of the C.J. Strike Reservoir. Much of the land surrounding the Reservoir is also included in the C.J. Strike Wildlife Management Area. The C.J. Strike Wildlife Management Area provides hunting, fishing, and wildlife viewing opportunities.

Portions of the C.J. Strike Wildlife Management Area, including the portion that abuts the Ranch, are closed to public access for six months of the year to allow game and waterfowl to nest and rear young.

5. Much of the land in the Bruneau Valley is privately owned and used for agriculture. The Ranch has historically been used for cattle grazing. Aerial photography shows that for generations, the Bruneau River, extensive wetlands, and native vegetation on the Ranch remained relatively undisturbed. However, Defendant's recent activities have drastically altered the Bruneau River and wetlands.

6. Defendant constructed multiple road crossings in the Bruneau River and wetlands. These roads disrupt and impede the flow of water in the Bruneau River and wetlands. The roads have washed away on multiple occasions, further polluting and disrupting the Bruneau River.

7. Defendant mined sand and gravel from the Bruneau River, disturbing the riverbed and its banks and discharging pollutants. Defendant placed sand, gravel, rocks, and debris on the banks of the Bruneau River, which alter and pollute the River. Defendant built large piles of sand and gravel in and near the Bruneau River and wetlands, and those piles discharge pollutants to the River.

8. Defendant cleared and leveled nearly all the Ranch's wetlands. Defendant conducted all these actions without required Clean Water Act permits.

9. On and near the Ranch, Defendant used heavy machinery to clear and level dozens of acres of wetlands to install roads and center-pivot irrigation systems. Defendant's actions caused discharges of dredged and/or fill material and other pollutants to the Bruneau River and wetlands adjacent to the Bruneau River without authorization under the Clean Water Act. Defendant's discharges occurred on the Ranch and on neighboring parcels of privately-

owned and state-owned land (collectively the "Site"), including a portion of the C.J. Strike Wildlife Management Area. Exhibit 1 is a depiction of the Site.

10. Defendant also conducts a sand and gravel mining operation at the Site and has operated heavy gravel mining, processing, and hauling equipment in and around the Bruneau River and adjacent wetlands without a Clean Water Act permit. Defendant's sand and gravel mining operation caused discharges of pollutants, including sediment, sand, gravel, and dredged and/or fill material to the Bruneau River and adjacent wetlands. Defendant's sand and gravel mining operation also caused storm water discharges from gravel piles to the Bruneau River and adjacent wetlands.

11. In this action, Plaintiff seeks to: (1) enjoin unauthorized discharges of pollutants, including sediment, sand, gravel, and dredged and/or fill material to the Bruneau River and adjacent wetlands; (2) enjoin unauthorized discharges of storm water to the Bruneau River and adjacent wetlands; (3) require Defendant, at its own expense and at the direction of EPA, to restore waters on the Site and mitigate the impacts caused by the unlawful activities, including by obtaining applicable permits; and (4) require Defendant to pay civil penalties as required by Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d).

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action and the parties under Sections 309(b) and (d) of the Clean Water Act, 33 U.S.C. § 1319(b) and (d), and under 28 U.S.C. §§ 1331, 1345, and 1355.

13. Venue is proper in the District of Idaho under Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395, because the violations occurred in this District and Defendant conducts business in this District.

14. Authority to bring this civil action is vested in the Attorney General of the United States under Section 506 of the Clean Water Act, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

15. Notice of the commencement of this action has been given to the State of Idaho under Section 309(b) of the Clean Water Act. 33 U.S.C. § 1319(b).

## DEFENDANT

16. Defendant is a limited liability partnership incorporated in the State of Idaho in 2008.

17. Defendant's principal business address is 28892 Hot Springs Road, Bruneau, Idaho 83604.

18. Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

19. Since 2008, Defendant has owned, operated, or otherwise controlled the Ranch.

20. Since 2008, Defendant has exercised control over the activities that discharged pollutants to waters of the United States without the required authorization at the Site.

## STATUTORY AND REGULATORY BACKGROUND

### A. Clean Water Act General Provisions

21. The Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

22. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" to "navigable waters" unless that discharge is authorized by a permit issued under Sections 402 or 404 of the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, and 1344.

23. Section 502(12) of the Clean Water Act defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

24. Section 502(6) of the Clean Water Act defines "pollutant" to include, among other things, dredged spoil, solid waste, chemical wastes, biological materials, rock, sand, cellar dirt, and industrial waste, and agricultural waste. 33 U.S.C. § 1362(6).

25. Section 502(14) of the Clean Water Act defines "point source" as "any discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, [or] rolling stock . . . from which pollutants may be discharged." 33 U.S.C. § 1362(14).

26. Section 502(5) of the Clean Water Act defines "person" to include, among other things, an "individual," "corporation," "partnership," or "association." 33 U.S.C. § 1362(5).

27. Section 502(7) of the Clean Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right (i.e., "adjacent wetlands") are included in this definition. *See Sackett v. EPA*, 598 U.S. 651, 678 (2023).

**B. Additional Definitions**

28. The term "wetlands" means "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (2014); 33 C.F.R. § 328.3(c)(1) (2024) (same).

29. Wetlands are "as a practical matter indistinguishable from waters of the United States"—and are therefore themselves covered by the Clean Water Act—"when" there is a

"continuous surface connection" between wetlands and covered waters. *Sackett*, 598 U.S. at 678 (quoting *Rapanos v. United States*, 547 U.S. 715, 742 (2006) (Scalia, J., plurality)).

30. As used in this Complaint, the term "adjacent wetlands" means wetlands with a continuous surface connection to waterbodies that are waters of the United States in their own right, consistent with *Sackett*.

31. The term "ordinary high water mark" means "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas."[1] 33 C.F.R. § 328.3(e) (2014); 33 C.F.R. § 328.3(c)(4) (2024) (same).

32. For non-tidal waters of the United States, in the absence of adjacent wetlands, Clean Water Act regulatory jurisdiction extends to the ordinary high water mark. 33 C.F.R. § 328.4(c)(1).

33. When adjacent wetlands are present, the Clean Water Act's regulatory "jurisdiction extends beyond the ordinary high water mark to the limit of the adjacent wetlands." 33 C.F.R. § 328.4(c)(2); *see also Sackett*, 598 U.S. at 678.

**C. Clean Water Action Section 402**

34. Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a), allows EPA to issue National Pollutant Discharge Elimination System ("NPDES") permits that authorize the discharge of pollutants, other than dredged and/or fill material, to waters of the United States.

[1] In the figures below, the ordinary high water mark is referred to by its acronym "OHWM."

35. Under Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b), EPA may authorize a state to issue NPDES permits.

36. Under Sections 309 and 402(i) of the Clean Water Act, 33 U.S.C. §§ 1319 and 1342(i), the United States retains concurrent authority with authorized states to enforce violations of permits issued under Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

37. On June 14, 2018, EPA granted the application by the State of Idaho to administer the Idaho Pollutant Discharge Elimination System ("IPDES") program and authorized Idaho to issue NPDES permits. 83 Fed. Reg. 27769 (June 14, 2018).

38. Following EPA's approval, Idaho's Department of Environmental Quality ("DEQ") assumed NPDES permitting authority for certain NPDES permits beginning on July 1, 2018, with full assumption of NPDES permitting authority by July 1, 2021. 83 Fed. Reg. 27769 (June 14, 2018). As applicable here, DEQ assumed permitting authority for individual NPDES industrial permits on July 1, 2019, and for NPDES storm water permits on July 1, 2021.

39. Under Sections 308 and 402 of the Clean Water Act, 33 U.S.C. §§ 1318 and 1342, EPA promulgated regulations relating to the control of storm water discharges at 40 C.F.R. § 122.26. Under 40 C.F.R. § 123.25, any state-authorized permitting authority must include such requirements in its NPDES permitting program.

40. Under 40 C.F.R. § 122.28, EPA may issue individual permits for a facility or general permits covering one or more categories of storm water discharges. Under 40 C.F.R. § 123.25, any authorized state permitting program may include provisions for general permits.

41. As it pertains to storm water, Idaho incorporated into its state law many federal NPDES regulations, including 40 C.F.R. § 112.26(a)-(b), 40 C.F.R. § 122.26(e)-(g), and Appendix A to 40 C.F.R. Part 122 (NPDES Primary Industry Categories). *See* Idaho Admin.

Code r. 58.01.25.003.02.

42. “Storm water” is defined as “storm water runoff, snow melt runoff, and surface water runoff and drainage.” 40 C.F.R. § 122.26(b)(13); Idaho Admin. Code r. 58.01.25.010.98.

43. A NPDES permit is required for storm water discharges associated with industrial activity. 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R. § 122.26 (adopted by reference in Idaho Admin. Code r. 58.01.25.003.02).

44. “Facilities classified as Standard Industrial Classifications 10 through 14 (mineral industry) including active or inactive mining operations” must have NPDES permits for discharges. 40 C.F.R. § 122.26(b)(14)(iii).

45. Sand and gravel mining is included in Standard Industrial Classification industry group 14.

46. Dischargers of storm water associated with industrial activity are required to apply for an individual permit or seek coverage under a general permit. 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R § 122.26(c)(1); Idaho Admin. Code r. 58.01.25.130.

**D. Clean Water Act Section 404**

47. Section 404(a) of the Clean Water Act, 33 U.S.C. § 1344(a) authorizes the Secretary of the Army, acting through the U.S. Army Corps of Engineers (“Corps”), or an authorized state, to issue permits for the discharge of dredged or fill material to waters of the United States.

48. In Idaho, the Corps issues permits under Section 404 of the Clean Water Act.

49. “Dredged material” is defined as “material that is excavated or dredged from waters of the United States.” 40 C.F.R. § 232.2.

50. "Fill material" is defined as "any material other than trash or garbage that replaces portions of the waters of the United States with dry land or which changes the elevation of a water body for any purpose." 40 C.F.R. § 232.2.

**E. Clean Water Act Enforcement Provisions**

51. Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

52. Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), subjects any person who violates Section 301 of the Clean Water Act, 33 U.S.C. § 1311, to civil penalties.

53. Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), establishes civil penalties for violating the Clean Water Act payable to the United States of up to $25,000 per day for each violation. Section 309(d) of the Clean Water Act further specifies that in determining the amount of a civil penalty, a court "shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

54. Maximum civil penalties for violations of the Clean Water Act are established by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4. EPA may seek civil penalties of up to $66,712.00 per day per violation of the Clean Water Act for violations after November 2, 2015, and assessed on or after December 27, 2023. 40 C.F.R. § 19.4.

## GENERAL ALLEGATIONS

**A. The Site, Waters, and Wetlands on the Site**

55. The Site consists of the Ranch and neighboring parcels of privately-owned and state-owned land, including a portion of the C.J. Strike Wildlife Management Area. Exhibit 1 is a depiction of the Site.

56. The Ranch has been used mainly for cattle grazing since at least 1940.

57. The Site is bisected by the Bruneau River, which has meandered through time, creating a network of channels and wetlands.

58. EPA first learned of Defendant's Clean Water Act violations at the Site via a complaint from a member of the public to the State of Idaho regarding roads built across the Bruneau River.

59. Defendant initially consented to a joint EPA and Corps visit to inspect the Ranch, which was scheduled to occur on May 18, 2021. But on the evening of May 17, 2021, Defendant withdrew consent and filed a complaint and a motion for preliminary injunction in the U.S. District Court for the District of Idaho seeking to prevent the agencies from entering the Ranch. The Court dismissed that complaint on February 4, 2022.

60. In May 2021, EPA sought and obtained an administrative warrant to inspect the Ranch from the U.S. District Court for the District of Idaho.

61. From June 14 through 16, 2021, EPA executed the administrative warrant, inspected the Ranch, and collected evidence of Clean Water Act violations ("2021 inspection").

62. From April 24 through April 28, 2023, EPA inspected the Ranch again, with Defendant's consent, and collected additional evidence of Clean Water Act violations ("2023 inspection").

63. During both the 2021 and 2023 inspection, agents of Defendant took photos and videos of EPA representatives.

64. The Bruneau River is a water of the United States, covered by the Clean Water Act.

65. The Bruneau River is an interstate water. It originates in Nevada and flows into Idaho.

66. The Bruneau River is a traditional navigable water because it is currently used, was used in the past, or may be susceptible to use in interstate or foreign commerce.

67. The Bruneau River supports recreational boating both upriver and downriver of the Site.

68. The Bruneau River is a relatively permanent standing or continuously flowing body of water connected to other traditional navigable waters, including the C.J. Strike Reservoir and the Snake River.

69. The wetlands at issue in this Complaint are adjacent wetlands, covered by the Clean Water Act. Adjacent wetlands at the Site have a continuous surface connection to the Bruneau River because the adjacent wetlands abut—meaning physically touch—the Bruneau River.[2]

---

[2] *See, e.g.*, *United States v. Mlaskoch*, No. 10-cv-2669, 2014 WL 1281523, at *17 (D. Minn. Mar. 31, 2014) ("Because the affected wetlands abutted these tributaries, jurisdiction under the CWA is proper."); *United States v. Donovan*, No. 96-484, 2010 WL 3000058, at *4 (D. Del. July 23, 2010) ("A continuous surface connection exists when a wetland physically abuts another regulated body of water.") (citation to *Rapanos* plurality omitted), report and recommendation adopted, 2010 WL 3614647 (D. Del. Sept. 10, 2010), *aff'd*, 661 F.3d 174 (3d Cir. 2011); *United States v. Brace*, No. 1:17-cv-00006, 2019 WL 3778394, at *24 (W.D. Pa. Aug. 12, 2019) (A "continuous surface connection" "may also occur when a wetland physically abuts another regulated body of water") (quoting *Donovan*, *supra*; *cleaned up*), *aff'd on other grounds*, 1 F.4th 137 (3d Cir. 2021); *United States v. Bedford*, No. 2:07-cv-491, 2009 WL 1491224, at *12 (E.D.

70. To the extent that some adjacent wetlands may not presently have a continuous surface connection to the Bruneau River, that is because of Defendant's violations. Under *Sackett*, wetlands that had a continuous surface connection to the Bruneau River prior to Defendant's violations are still adjacent wetlands. 598 U.S. at 678 n.16 ("[A] landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA. Whenever the EPA can exercise its statutory authority to order a barrier's removal because it violates the Act, see 33 U.S.C. §§ 1319(a)–(b), that unlawful barrier poses no bar to its jurisdiction.").

71. Prior to Defendant's violations of the Clean Water Act occurring in and after October 2017, the adjacent wetlands had a continuous surface connection to the Bruneau River. Defendant's illegal conduct of placing illegal fill and other pollutants between the wetlands and the River had the effect of altering some of the adjacent wetlands' continuous surface connections to the Bruneau River.

72. The adjacent wetlands abut the Bruneau River at multiple points and run parallel with the Bruneau River as it flows through the Site and into the C.J. Strike Reservoir.

73. Where the adjacent wetlands abut the Bruneau River, water is exchanged between the River and the adjacent wetlands, including surface water.

74. Depending on the weather, the volume of water in the Bruneau River and the adjacent wetlands, the flow rates, the time of year, and other factors, water at times flows from the wetlands to the Bruneau River and at times flows from the River to the wetlands.

---

Va. May 22, 2009) (holding that "there is a continuous surface connection between the wetlands on the Bedford Site and the Southern Tributary" because "the wetlands are adjacent to, contiguous with, directly abut, and drain into the Southern Tributary").

75. The physical connection between the Bruneau River and the adjacent wetlands that facilitates the exchange of water between the adjacent wetlands and the Bruneau River constitutes a continuous surface connection.

76. The wetlands at the Site were mapped by combining the following empirical and analytical observations: observing historical aerial imagery from 1940 through the present, observing Light Detection and Ranging ("Lidar") imagery, observing maps from the National Wetlands Inventory and maps of soil types, and assessing and observing the wetlands (including their hydrology, soils, and vegetation) during the 2021 and 2023 inspections.

77. There are several points where the Site's adjacent wetlands abut the Bruneau River.

78. The ordinary high water mark of the Bruneau River at the Site was mapped by combining the following empirical and analytical observations: observing historical aerial imagery from 2017 through the present, observing Lidar imagery, reviewing historical stream gauge data from 2017 through the present, observing the Bruneau River during the 2021 and 2023 inspections, conducting multiple transects of the Bruneau River during the 2021 and 2023 inspections, and conducting surface water flow modeling of Bruneau River.

This Space Left Intentionally Blank

79. Figure 1, below, is a map showing where the United States alleges wetlands are located on the Site. Most of these wetlands are adjacent wetlands meaning they abut the Bruneau River and thus have a continuous surface connection to the Bruneau River.[3] Points where the adjacent wetlands abut the River are noted. The Figure also depicts the ordinary high water mark ("OHWM") of the Bruneau River.

**Figure 1**




[3] Figure 16, below, identifies the wetlands Defendant discharged pollutants to and illegally filled that are jurisdictional wetlands (waters of the United States), i.e., adjacent wetlands that currently abut the Bruneau River or did abut the River, prior to Defendant's illegal conduct.

80. Figure 2, below, is a wider-scale map showing the location of wetlands on the Site as well as the wetlands located parallel to the Bruneau River and showing several examples of where the adjacent wetlands abut and thus have a continuous surface connection to the River. The adjacent wetlands abut the River at numerous points on the Site and also both upstream and downstream from the Site.

**Figure 2**




81. The Bruneau River and adjacent wetlands are "waters of the United States" within the meaning of the Clean Water Act. 33 U.S.C. § 1362(7).

**B. Clean Water Act Section 402 Discharges**

82. Since at least October 2017 and continuing at least through 2022, Defendant conducted activities related to sand and gravel mining on the Site in and around the Bruneau River and adjacent wetlands.

83. During EPA's 2021 and 2023 inspections, EPA collected evidence of activities related to sand and gravel mining.

84. During the 2021 and 2023 inspections, EPA observed sand and gravel mining, processing, and hauling equipment located on the Site, observed heavy machinery tracks and evidence of mechanical scraping, pushing, and pulling of dirt, sand, gravel, rock, or sediment in and next to the Bruneau River and adjacent wetlands, and observed large piles of sand and gravel near the Bruneau River, along its banks, and in adjacent wetlands.

85. Historical aerial imagery since October 2017 reveals sand and gravel mining operations and equipment on the Site. It also reveals large piles of sand, gravel, or other aggregate materials located within and adjacent to the ordinary high water mark of the Bruneau River.

This Space Left Intentionally Blank

86. Figures 3.1 through 3.3, below, are a series of aerial images from November 22, 2017, showing signs of scraping, pushing, and pulling of dirt, sand, gravel, rock, or sediment caused by a bulldozer or other heavy earthmoving equipment in the Bruneau River on the Site, revealing active sand and gravel mining within the ordinary high water mark of the Bruneau River. White arrows point to some evidence of this illegal conduct. White boxes identify some of the large piles of sand, gravel, or other aggregate materials next to the ordinary high water mark.

**Figure 3.1**




This Space Left Intentionally Blank

**Figure 3.2**




**Figure 3.3**



87. Figure 4, below, is an aerial image from May 30, 2021, showing large tire tracks and signs of scraping, pushing, and pulling of dirt, sand, gravel, rock, or sediment caused by a bulldozer or other heavy earthmoving equipment in the Bruneau River on the Site, revealing active sand and gravel mining within the ordinary high water mark of the Bruneau River. White arrows point to some evidence of this illegal conduct.

**Figure 4**




88. Defendant conducts sand and gravel mining activities using heavy earthmoving, processing, and hauling equipment.

This Space Left Intentionally Blank

89. Figure 5, below, is a collection of photographs taken during the 2021 inspection depicting some of the heavy earthmoving equipment found on the Site.

**Figure 5**



This Space Left Intentionally Blank

90. Figure 6, below, is a collection of photographs taken during the 2021 inspection depicting some of the sand and gravel processing equipment found on the Site.

**Figure 6**




This Space Left Intentionally Blank

91. Figure 7, below, is a collection of photographs taken during the 2021 inspection depicting some of the sand and gravel hauling equipment found on the Site.

**Figure 7**




92. Defendant's heavy mining, processing, and hauling equipment constitutes "point sources" as defined in Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

93. Defendant's heavy mining, processing, and hauling equipment discharged pollutants, including dirt, sand, gravel, rock, or sediment to the Bruneau River and adjacent wetlands.

94. Sand and gravel piles constitute "point sources" as defined in Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

95. When the water level in the Bruneau River is high, water from the River inundates nearby areas, causing pollutant discharges from sand and gravel material used to construct mining roads near the River, material located along the River's banks, and piles of sand and gravel material located close to the River.

96. In addition, storm water runs off sand and gravel piles during precipitation events and discharges pollutants to the Bruneau River and adjacent wetlands.

97. Defendant sells gravel, and, on at least two occasions, sold gravel to the Idaho Department of Fish and Game.

98. Defendant registered itself with the U.S. Department of Transportation ("USDOT"), obtained a USDOT registration number, and renews its registration annually.

99. Defendant's USDOT registration number is 604404.

100. Defendant's current USDOT registration states that Defendant operates interstate and transports gravel.

101. Defendant's sand and gravel mining activities caused unauthorized discharges of "pollutants" as defined in Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

102. At all relevant times, Defendant did not have a permit under Section 402 of the Clean Water Act. 33 U.S.C. § 1342.

**C. Clean Water Act Section 404 Discharges (Dredged and/or Fill Material)**

103. Since at least October 2017 and continuing through at least 2022, Defendant used equipment, including heavy machinery, to clear, grade, and fill portions of the Site.

104. These portions of the Site that Defendant cleared, graded, and filled included wetlands that abut and exchange water flow with the Bruneau River and parts of the River itself.

105. During EPA's 2021 and 2023 inspections, EPA collected evidence of dredge and fill activities in the Bruneau River and adjacent wetlands.

106. The equipment Defendant used for its clearing, grading, and filling activities constitutes "point sources" as defined in Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

107. The equipment Defendant used for its clearing, grading, and filling activities is likely the same or similar to the equipment identified above in paragraphs 89 and 91 and Figures 5 and 7.

108. One purpose of Defendant's clearing, grading, and filling activities was to eventually install and operate center-pivot irrigation systems at the Site.

109. Around April 2018, in the area east of the Bruneau River on the Ranch, Defendant began installing three center-pivot irrigation systems. They became visible from satellite imagery as early as April 2019.

110. Around April 2019, in the area west of the Bruneau River on the Ranch, Defendant began installing two center-pivot irrigation systems. They became visible from satellite imagery as early as March 2020.

111. EPA examined satellite imagery and consulted elevation data and other relevant available information to map the locations of wetlands, their connections to the Bruneau River, and the locations of Defendant's placement of fill material at the Site.

112. During EPA's April 2023 inspection of the Site, EPA used a small excavator to dig sample plots a few feet deep in locations that EPA had identified as containing wetlands and fill material.

113. The sample plots confirmed the presence of wetlands. EPA observed the presence of hydric soil indicators, hydrophytic vegetation adapted for life in saturated soil conditions, and hydrology at the sampling plots. The sample plots also confirmed that a layer of fill material had

been placed in and on top of wetlands and wetland vegetation.

114. EPA observed several places on the Site where wetlands abut (or prior to the unlawful fill did abut) the Bruneau River.

115. Figure 8, below, depicts the location of sample plots where EPA found a layer of fill material on top of adjacent wetlands.

**Figure 8**




116. Figures 9.1 through 9.3, below, are a series of aerial images from July 20, 2019, showing signs of scraping, pushing, and pulling of dirt, sand, gravel, rock, or sediment caused by a bulldozer or other heavy earthmoving equipment that discharged fill material into wetlands that abut and connect to the Bruneau River. White arrows point to evidence of this illegal conduct.

**Figure 9.1**




**Figure 9.2**



**Figure 9.3**




117. Defendant also used equipment, including heavy machinery, to construct roads on the Site. Some portions of the roads that Defendant constructed crossed the Bruneau River and/or adjacent wetlands.

118. Defendant constructed the road-crossings by using equipment, including heavy earthmoving equipment, to discharge dredged and/or fill material to the Bruneau River and adjacent wetlands.

119. The equipment Defendant used for its road construction is likely the same or similar to the equipment identified above in paragraphs 89 and 91 and Figures 5 and 7.

120. From 2017 through at least 2023, Defendant had constructed multiple road-crossings in the Bruneau River and adjacent wetlands on the Site.

121. Figure 10, below, is an aerial photograph from January 1, 2018, showing the presence of a road illegally built by Defendant crossing the Bruneau River on the Site. The white arrow points to the illegal road across the Bruneau River.

**Figure 10**




This Space Left Intentionally Blank

122. Figure 11, below, is an aerial photograph from October 26, 2022, showing the presence of a second road illegally built by Defendant crossing the Bruneau River on the Site. The white arrow points to the illegal road across the Bruneau River. This road effectively dammed the Bruneau River, causing water to back up and allowing very little water to flow down the River.

**Figure 11**




This Space Left Intentionally Blank

123. Figure 12, below, is an aerial photograph from March 27, 2023, showing the presence of a third road illegally built by Defendant crossing the Bruneau River on the Site. The white arrow points to the illegal road across the Bruneau River.

**Figure 12**




124. Prior to Defendant's illegal fill and roadbuilding activities, wetlands on the Site abutted the Bruneau River at multiple points.

125. Sometime in 2019 or later, Defendant discharged fill material to the Bruneau River and abutting wetlands to construct a road along the western bank of the Bruneau River ("Western Bank Road"). Defendant's conduct had the effect of altering some of the adjacent wetlands' continuous surface connections to the Bruneau River.

126. Figure 13, below, depicts the location of the Western Bank Road and several points where, prior to constructing the road, adjacent wetlands had a continuous surface connection to the Bruneau River. The Western Bank Road has a north and south section. The Figure also shows the location of other roads illegally built through adjacent wetlands and the Bruneau River since at least October 2017.

**Figure 13**




127. However, because of the strength of the connection between the adjacent wetlands and Bruneau River, at least one part of the Western Bank Road has been washed out by surface water flow between the adjacent wetlands and the Bruneau River, thus reestablishing the surface water flow between the adjacent wetlands and Bruneau River.

128. Figure 14, below, is a photograph taken from an aerial reconnaissance flight on March 25, 2024, that depicts where the adjacent wetlands and Bruneau River reestablished their surface water flow by washing out the northern part of the Western Bank Road, which had been illegally constructed by Defendant. ABR 38 is one of the sample plots depicted in Figure 8, above, where EPA found the presence of wetlands with a layer of illegal fill material on top and mixed in.

**Figure 14**



129. Figures 15.1 and 15.2, below, show an aerial image from July 7, 2017, where the adjacent wetlands abutted and thus had a continuous surface connection to the Bruneau River prior to Defendant's illegal conduct. For comparison purposes, each Figure also includes an aerial image from May 10, 2024, showing where Defendant constructed the Western Bank Road by filling adjacent wetlands and a portion of the Bruneau River.

**Figure 15.1**




This Space Left Intentionally Blank

**Figure 15.2**




130. Also visible in Figure 15.2 (the May 10, 2024 image) is where the wetland and Bruneau River reestablished their surface water flow and washed out the Western Bank Road after Defendant's illegal road building and filling. This image presents a different view of the reestablishment of surface flow between the wetlands and the River depicted in Figure 14, above.

131. Defendant's road construction activities did not follow best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the Bruneau River and adjacent wetlands were not impaired, that the reach of these waters was not reduced, and that any adverse effect on the aquatic environment was otherwise minimized.

132. Defendant attempted to stabilize the bank of the Bruneau River by using equipment, including heavy machinery, to discharge dredged and/or fill material to the Bruneau River and adjacent wetlands.

133. The equipment Defendant used to construct roads and stabilize the Bruneau River's bank constitutes "point sources" as defined in Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

134. Defendant also discharged dredged and/or fill material to the Bruneau River and adjacent wetlands while using heavy gravel mining, processing, and hauling equipment to conduct sand and gravel mining operations.

135. The equipment Defendant used for its sand and gravel mining operations constitutes "point sources" as defined in Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

136. Defendant's clearing and grading, roadbuilding, bank stabilization, and sand and gravel mining activities resulted in the unauthorized discharge of "pollutants" as defined in Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6), including dredged and/or fill material, to waters of the United States.

137. Defendant's clearing and grading, roadbuilding, bank stabilization, and sand and gravel mining activities severely altered the Bruneau River and adjacent wetlands.

138. Defendant's clearing and grading, roadbuilding, bank stabilization, and sand and gravel mining activities were aimed at bringing areas of the Bruneau River and adjacent wetlands into a use to which they were not previously subject.

139. Defendant's clearing and grading, roadbuilding, bank stabilization, and sand and gravel mining activities impaired the flow and circulation of the Bruneau River and adjacent wetlands.

140. Defendant's clearing and grading, roadbuilding, bank stabilization, and sand and gravel mining activities reduced the reach of the Bruneau River and adjacent wetlands.

141. At all relevant times, Defendant did not have a permit under Section 404 of the Clean Water Act. 33 U.S.C. § 1344.

142. Figure 16, below, is a graphic summary of where Defendant discharged dredged and/or fill material and other pollutants to waters of the United States, including the Bruneau River and adjacent wetlands. The red circles are sample plots where EPA found wetlands and illegal fill material. The pink layer shows the jurisdictional wetlands Defendant filled illegally. And the yellow layer shows where Defendant conducted sand/gravel mining near and within the ordinary high water mark of the Bruneau River and discharged dredged and/or fill material and other pollutants to the Bruneau River.

**Figure 16**



**FIRST CLAIM FOR RELIEF**

Illegal Discharges of Pollutants in Violation of Section 301(a) of the Clean Water Act,
33 U.S.C. § 1311(a)

143. The United States realleges and incorporates Paragraphs 1 through 142.

144. The United States and Defendant entered into a Tolling Agreement and amendments thereto that tolled the statute of limitations from October 20, 2022 to March 21, 2024.

145. Since at least October 2017 and continuing at least through 2022, Defendant conducted sand and gravel mining activities in and next to waters of the United States, including the Bruneau River and adjacent wetlands, that resulted in discharges of pollutants to waters of the United States.

146. Since at least October 2017 through the present, Defendant stockpiled sand and gravel in the Bruneau River and alongside its banks, which, during precipitation events, caused and continue to cause storm water "discharges associated with industrial activity" within the meaning of Section 402(p)(2)(B) of the Clean Water Act and Idaho law. 33 U.S.C. § 1342(p)(2)(B); Idaho Admin. Code r. 58.01.25.003.02 (adopting by reference 40 C.F.R. § 122.26). Those storm water discharges flowed to the Bruneau River and adjacent wetlands.

147. Since at least October 2017 through the present, when water levels in the Bruneau River have been high, water flow from the River reached sand and gravel materials used to construct mining roads in the River, sand and gravel piles alongside the River's banks, and sand and gravel piles near the River, causing discharges of pollutants.

148. Sand, gravel, sediment, and other materials discharged to the Bruneau River from the heavy gravel mining, processing, and hauling equipment Defendant used for gravel mining are pollutants, as defined by Section 502(6) of the Clean Water Act.

149. Storm water discharged from stockpiled sand and gravel piles is a pollutant, as defined by Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

150. The Bruneau River and wetlands adjacent to the Bruneau River are "waters of the United States" within the meaning of Section 502(7) of the Clean Water Act. 33 U.S.C. §1362(7).

151. Each piece of equipment used by Defendant to mine sand and gravel in and around the Bruneau River is a "point source" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

152. The stockpiles of sand and gravel material in the Bruneau River, alongside its banks, and near the River that convey storm water and other pollutants to the Bruneau River are each a "point source" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

153. Since at least October 2017 through the present, Defendant has neither applied for nor obtained a permit under Section 402 of the Clean Water Act to discharge storm water or other pollutants to waters of the United States. 33 U.S.C. § 1342.

154. Defendant violated Section 301 of the Clean Water Act by discharging storm water and other pollutants from point sources to waters of the United States. 33 U.S.C. § 1311(a).

155. Each day of each discharge constitutes a separate violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

156. Defendant is strictly liable to the United States for injunctive relief and civil penalties under Sections 309(b) and (d) of the Clean Water Act. 33 U.S.C. §§ 1319(b), (d).

## SECOND CLAIM FOR RELIEF

Illegal Discharges of Dredged and/or Fill Material in Violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a)

157. The United States realleges and incorporates Paragraphs 1 through 156.

158. The United States and Defendant entered into a Tolling Agreement and amendments thereto that tolled the statute of limitations from October 20, 2022 to March 21, 2024.

159. Since at least October 2017 and continuing at least through 2022, Defendant discharged dredged and/or fill material to waters of the United States, including the Bruneau River and adjacent wetlands.

160. The dredged and/or fill material Defendant discharged to the Bruneau River and adjacent wetlands are pollutants, as defined by Section 502(6) of the Clean Water Act. 33 U.S.C. § 1362(6); 33 C.F.R. § 323.2.

161. The Bruneau River and adjacent wetlands are "waters of the United States" within the meaning of Section 502(7) of the Clean Water Act. 33 U.S.C. § 1362(7).

162. Each piece of equipment used by Defendant that discharged dredged and/or fill material on the Site is a "point source" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

163. Since at least October 2017 through the present, Defendant has neither applied for nor obtained a permit under Section 404 of the Clean Water Act to discharge dredged and/or fill material to waters of the United States. 33 U.S.C. § 1344.

164. Defendant violated Section 301 of the Clean Water Act by discharging pollutants from point sources to waters of the United States. 33 U.S.C. § 1311(a).

165. Each day of each discharge constitutes a separate violation of Section 301(a) of the Clean Water Act. 33 U.S.C. § 1311(a).

166. Defendant is strictly liable to the United States for injunctive relief and civil penalties under Sections 309(b) and (d) of the Clean Water Act. 33 U.S.C. §§ 1319(b), (d).

## RELIEF SOUGHT

Plaintiff respectfully requests that this Court order the following relief:

1. Declare that Defendant violated Section 301 of the Clean Water Act by discharging pollutants to waters of the United States without permits under Sections 402 and 404 of the Clean Water Act.

2. Permanently enjoin Defendant from discharging or causing the discharge of pollutants, including sediment, sand, gravel, and dredged and/or fill material, to waters of the United States except in compliance with the Clean Water Act.

3. Permanently enjoin Defendant from discharging or causing the discharge of storm water to waters of the United States except in compliance with the Clean Water Act.

4. Require Defendant to undertake measures, at its own expense and at the direction of EPA, to completely restore the impacted portions of the Bruneau River and adjacent wetlands and mitigate the impact caused by Defendant's unauthorized discharges to waters of the United States, including by obtaining applicable permits.

5. Assess civil penalties against Defendant under Section 309(d) of the Clean Water Act for each day of each violation of Section 301 of the Clean Water Act. 33 U.S.C. § 1319(d); 33 U.S.C. § 1311(a).

6. Any other relief the Court deems just and proper.

DATED: September 27, 2024

Respectfully submitted,

TODD KIM
Assistant Attorney General

JOSHUA D. HURWIT
United States Attorney

CHRISTINE G. ENGLAND
Assistant United States Attorney
District of Idaho
1290 W. Myrtle St. Suite 500
Boise, ID 83702-7788
Telephone: (208) 334-1211
Facsimile: (208) 334-9375
Email: Christine.England@usdoj.gov

/s/ Jeffrey Hammons
NATALIE BAUGHMAN
JEFFREY HAMMONS
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044
(202) 353-5027 (Baughman)
(202) 598-6925 (Hammons)
(202) 514-8865 (Fax)
Natalie.Baughman@usdoj.gov
Jeffrey.Hammons@usdoj.gov

SONYA J. SHEA
Senior Attorney
United States Department of Justice
Environment & Natural Resources Division
999 18th Street; South Terrace; Suite 370
Denver, CO 80202
(303) 844-7231
Sonya.Shea@usdoj.gov

OF COUNSEL:
PATRICK JOHNSON
Senior Water Law Attorney
United States Environmental Protection Agency

Region 10, Alaska Operations Office
222 West 7th Avenue, No. 19
Anchorage, AK 99513
(907) 271-3914
Johnson.patrick@epa.gov

*Attorneys for Plaintiff*